# EXHIBIT C

MELINDA L. HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

W.S. WILSON LEUNG (CABN 190939)
ANDREW M. SCOBLE (CABN 124940)
C. DAVID HALL (CABN 66081)
Assistant United States Attorneys

THERYN G. GIBBONS (NYBN 4612867)
Trial Attorney, United States Department of Justice, Organized Crime and Gang Section

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-6758
    Facsimile: (415) 436-6753
    E-Mail: wilson.leung@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | S3-08-CR-0730-WHA |
| | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANT VELASQUEZ'S MOTION |
| | ) | TO DISMISS BASED ON ALLEGED |
| | ) | GRAND JURY MISCONDUCT |
| DANILO VELASQUEZ, | ) | |
| | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

## I.    Introduction

        The Government respectfully submits this response to defendant Danilo Velasquez's

motion to dismiss for alleged grand jury misconduct, i.e., the Grand Jury improperly indicted him

based on the putatively perjured testimony of Alexander Izaguirre.  Because the defendant cannot

establish he has suffered actual prejudice from this claimed error, his motion to dismiss should

be denied.

//

## II.    Applicable Law

The validity of an indictment is seldom successfully challenged. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v. United States, 350 U.S. 359, 363 (1956). Thus, "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988); see United States v. Caruto, __ F.3d __, 2011 WL 5120524, at *4 (9th Cir. Oct. 31, 2011) ("We recently observed that the Supreme Court, in Bank of Nova Scotia v. United States, 487 U.S. 250 (1988), 'adopted the standard . . . that for errors brought to the district court's attention 'prior to the conclusion of the trial,' dismissal of the indictment 'is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.'") (quoting United States v. Navarro, 608 F.3d 529, 539 (9th Cir. 2010)); see also United States v. Bari, 750 F.2d 1169, 1176 (2d Cir. 1984) (noting that grand jury proceedings "ought not be viewed as a fertile ground to be combed for evidentiary or other error").

## III.    Discussion

Given these principles, the defendant's motion to dismiss should be denied. Even assuming that the Grand Jury was unintentionally exposed to perjured[1] testimony, the defendant

---

[1]The Government has characterized Izaguirre's grand jury testimony as perjurious and has not, nor will, rely upon it in the prosecution of this case. However, the defense's assertion that the Government was aware that *all* of Izaguirre's information relating to the Daly City BART shooting came from Wilson Villalta merits further scrutiny. Notably, while Villalta candidly admitted that he provided Izaguirre with information about the murder and that the two concocted the story of Izaguirre hearing Herrera's admissions while watching television, up until his recent trial testimony, Villalta also noted that he believed Izaguirre may have overheard independently some of what Luis Herrera admitted. See, e.g., Def. Ex. F at WV-000041 (ROI stating "Villalta claims that he did not give Izaguirre any details, and Izaguirre overhead the details about the Daly City BART shooting."); Def. Ex. G at S3-004037 (Daly City Police Report of Villalta interview stating, "Izaguirre also talked to Killer and made friends with him. Izaguirre apparently learned some details of the Daly City BART murder from Killer that were even unknown to Villalta. Some of these details included the fact that Killer, Triste, and Tweety

has failed to establish how this error prejudiced him in light of the other evidence presented to the Grand Jury.

As an initial matter, the testimony of Alexander Izaguirre on which the defendant bases his motion focused on Luis Herrera, not the defendant. Izaguirre claimed (falsely) to the Grand Jury that, while watching a television news story about the Daly City BART shooting, Herrera stated that he (Herrera), "Tootie," and "El Triste" were responsible for the Daly City BART shooting. Similarly, the testimony of Special Agents John Moore and Alicia MacDonald merely contained the double hearsay statements of Herrera, Izaguirre's statements to agents regarding Herrera's statements to him. Although hearsay is admissible in a grand jury proceeding, the Grand Jury was specifically warned that hearsay is based not on the personal observations of a witness but on what the witness learned from others. See, e.g., Def. Ex. C at 6 (September 10, 2009 grand jury testimony of John Moore, during which Grand Jury was instructed regarding the definition of hearsay). Thus, the Grand Jury that indicted the defendant was able to discount the probative value of Izaguirre's information against the defendant. As such, the information provided by Izaguirre on its face had minimal influence, if any at all, on the Grand Jury's decision to indict the defendant.

---

dumped their stolen car in the Castro immediately after the shooting."). Thus, the same source who cast doubt on Izaguirre's grand jury testimony     Wilson Villalta     also indicated that Izaguirre lied not about having information relating to the BART shooting or the substance of the information, but only about *how* Izaguirre acquired it, i.e., overheard it from Herrera versus being told directly by Herrera, which led the Government to conclude that, although Izaguirre would not be a suitable prosecution witness, his false statements to the Grand Jury were limited and immaterial.

The Government would note that it has been limited in how it could confront Izaguirre about his false statements. Given that Izaguirre faced possible criminal liability for his grand jury testimony, and given that the Government understood that he was represented by counsel in pending criminal proceedings at all times, the Government could not freely interview Izaguirre. Indeed, because of these constraints, the Government was at a disadvantage in responding to the recent assertions contained in the declaration filed by Keith McArthur, the investigator for (now convicted) co-defendant Luis Herrera. (The Government hopes that the defense complied with its own professional obligations and sought the consent of Izaguirre's attorney before interviewing Izaguirre and eliciting from him highly inculpatory statements.).

More importantly, the Grand Jury was presented with a mountain of evidence entirely independent of Izaguirre's information on which it could easily have found probable cause to indict the defendant for conspiring to participate in the conduct of the affairs of MS-13 (Count One), conspiring to commit murder and assault with a dangerous weapon in aid of MS-13 (Counts Two and Three), and possessing a firearm (or aiding and abetting another's possession of a firearm) in furtherance of the MS-13 related racketeering related conspiracies (Count Four). For instance, the Grand Jury was presented with evidence that:

1.      The defendant was shot at Mission Playground on March 28, 2008, and that several hours following his shooting, Ernad Joldic and Philip Ng were shot and killed.  The next day, on March 30, 2008, MS-13 member Erick Lopez was arrested with the gun used to kill Joldic and Ng.  See Gov. Ex. A (June 25, 2009 grand jury testimony of Special Agent Benjamin Horton).

2.      Following the arrest of MS-13 member Erick Lopez for possession of the firearm used in the retaliatory killings of Joldic and Ng, the defendant called Lopez's mother (Nancy Lopez) and asked if she had any money for her son.  The defendant also stated he was going to give money to Erick Lopez in jail.  See Gov. Ex. B (June 25, 2009 grand jury testimony of Special Agent Benjamin Horton, reading back October 16, 2008 grand jury testimony of Nancy Lopez).

3.      A source    Wilson Villalta    reported, inter alia, that "Danilo Arturo Velasquez," along with Giovanni Hernandez, Jaime Balam, and Luis Herrera were involved in the Daly City BART shooting, and that, based on further investigation including conferring with local law enforcement officers, Danilo Arturo Velasquez was a member of MS-13 known as "Triste." Def. Ex. C at 7-8, 11 (September 10, 2009 grand jury testimony of Special Agent John Moore).  In addition, other cooperating witnesses reported that Danilo Velasquez and Giovanni Hernandez were sharing MS-13's leadership duties on the street.  See id. at 17.

4.      Luis Herrera's fingerprint was found on an item in an abandoned stolen Honda, the license plate for which was similar to the Honda that a witness reported the gunmen used in the Daly City BART shooting.  See Def. Ex.D at 17-19 (September 3, 2009 grand jury testimony

1    of Special Agent Alicia MacDonald); C at 27 (September 10, 2009 grand jury testimony of

2    Special Agent John Moore).

3         5.    Telephone records for a telephone seized from the defendant, along with records

4    for a telephone used by Giovanni Hernandez, indicated that the two were in communication

5    during the evening of the Daly City BART shootings.  The historical cell site records for these

6    telephones also indicated that the telephones     and by inference, their users     were in contact

7    with a cell tower located at Mission Street and John Daly Boulevard (Tower 497)     which was

8    within a few blocks of the BART shootings     for calls made at approximately 7:01 pm, 7:03

9    pm, and 7:06 pm, i.e., at around the time of the BART shootings.  Velasquez's telephone later

10   contacted cell tower 473, which is near the location where the stolen Honda referenced above

11   was recovered.  See Def. Ex. C at 19-27 (September 10, 2009 grand jury testimony of Special

12   Agent John Moore).

13        6.    Following the arrests of Luis Herrera and Wilson Villalta with one of guns used in

14   the Daly City BART shootings, Herrera and Villalta made several calls from jail during which

15   they spoke with Giovanni Hernandez and the defendant.  See Def. Ex. D at 20-27 (September 3,

16   2009 grand jury testimony of Special Agent Alicia MacDonald).  During the call with the

17   defendant, the defendant sounded upset because they could not figure out where the "Suzy"

18   i.e., code for "Uzi"     was located.  See id. at 26-27.

19        Based on this information alone, there was ample evidence from which the grand jury

20   could find probable cause that the defendant conspired to conduct the affairs of MS-13, conspired

21   to commit murder in aid of MS-13, conspired to commit assault with a dangerous weapon in aid

22   of MS-13, and possessed a firearm (or aided and abetted another's possession of a firearm) in

23   furtherance of the MS-13 related racketeering conspiracies.  Among other conclusions that could

24   be drawn from the evidence are: the defendant was specifically identified not only as a member

25   of MS-13, but as a leader of the gang; the defendant's shooting at Mission Playground led to a

26   retaliatory double murder by an MS-13 member, Erick Lopez, indicating that the defendant was

27   in fact an MS-13 member; following Lopez's arrest, the defendant was going to put money on

28   Lopez's jail commissary account, again evincing the defendant's ties to MS-13; Wilson Villalta

1  reported that the defendant, along with Luis Herrera, Giovanni Hernandez, and Jaime Balam,

2  were responsible for the Daly City BART shootings; the defendant's cellular telephone records

3  place him near the location of the BART shootings near the time of the shootings, as well as near

4  the location where the vehicle used in the shootings (i.e., that had an item with Luis Herrera's

5  fingerprint in it as well as a license plate number that was similar to the suspects' car's plate) was

6  found; and the defendant's conversation regarding the "Suzy" evinces the defendant's

7  involvement in the gang and its possession and use of firearms.  Accordingly, the defendant

8  cannot show actual prejudice as required under Bank of Nova Scotia.  See, e.g., United States v.

9  Spillone, 879 F.2d 514, 521 (9th Cir. 1989) (although errors affecting fundamental fairness are

10 reviewable, technical violations are not reviewable); United States v. Benny, 786 F.2d 1410,

11 1421 (9th Cir. 1986) (no dismissal of indictment based in part on witness's perjured testimony

12 when grand jury heard other competent testimony and was aware of possibility witness lied);

13 United States v. Lopez-Gutierrez, 83 F.3d 1235, 1244 (10th Cir. 1996) (no dismissal of

14 indictment based on unintentional presentment of false evidence to the grand jury by the

15 government regarding defendant's criminal history or comments referring to defendant's

16 invocation of his Fifth Amendment right to remain silent because both statements could be

17 characterized as technical errors that did not infringe on grand jury's ability to exercise

18 independent judgment).

19      Moreover, the defendant's reliance on United States v. Basurto, 497 F.2d 781 (9th Cir.

20 1974), is misplaced.  Basurto was decided in 1974, more than thirty  five years ago, and    more

21 significantly    fourteen years before the Supreme Court's controlling decision in Bank of Nova

22 Scotia.  Bank of Scotia, of course, requires a defendant seeking dismissal of an indictment based

23 on grand jury improprieties to establish actual prejudice, i.e., that, but for the error, the grand jury

24 would not have found probable cause to indict, or, phrased differently, that the grand jury could

25 not possibly have found probable cause to indict from the other evidence presented to it.

26 However the Court casts the inquiry, the defendant has failed to meet his burden.

27      Finally, as a last desperate grasp, the defendant asks the Court to strike all overt acts

28 relating to the Daly City BART shootings if the Court is not going to dismiss the indictment.

The defendant, of course, cites absolutely no legal authority for this request, and it should be denied on this ground alone. In addition, the defendant continues to misunderstand the crimes with which he has been charged. He is not charged with the Daly City BART shootings. He is charged with three racketeering related conspiracies and a firearms violation based on his involvement in the MS-13 racketeering enterprise. There is no overt act requirement for any of the conspiracies. See, e.g., Salinas v. United States, 522 U.S. 52, 63 (1997) (holding no overt act required for racketeering conspiracy under 18 U.S.C. § 1962(d)); compare 18 U.S.C. § 1959 with 18 U.S.C. § 371 (the latter specifically requiring commission of overt act while the former does not). Thus, the defendant's request to strike overt acts that are not even required to be alleged, let alone proven, has no merit.

**IV. Conclusion**

For all of the foregoing reasons, the defendant's motion to dismiss the indictment should be denied, as should his request for the striking of certain overt acts.


DATED: November 16, 2011                    Respectfully submitted,

                                            MELINDA HAAG
                                            United States Attorney


                                            By:    /s/
                                                _____
                                            W.S. Wilson Leung
                                            C. David Hall
                                            Andrew M. Scoble
                                            Assistant United States Attorneys

                                            Theryn G. Gibbons
                                            Trial Attorney